UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STANLEY SHEPHERD, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION No. 3:05-CV-1442-D |
| | § | |
| DALLAS COUNTY, | § | ECF |
| | § | |
| Defendant. | § | |

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

I.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  STATEMENT OF THE APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. ARGUMENT & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     Conditions of Confinement

     A.   Evidence on Conditions of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.   The Health Management Associates Report . . . . . . . . . . . . . . . . . . . . . 13

          2.   The Department of Justice Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     B.   Dallas County Retains UTMB to Provide Medical Care at the Jail . . . . . . . . . . 17

          1.   Dallas County Excluded Its Medical Director From the Decision
               to Award the UTMB Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          2.   From the Beginning, Dallas County Knew That the Costs It
               Contracted to Pay to UTMB Were Insufficient to Provide
               Adequate Medical Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          3.   The UTMB Contract Was Inadequately Monitored and Enforced . . . . . 21

     C.   Conditions of Confinement at the Dallas County Jail Result in
          Constitutionally Inadequate Medical Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          1.   Ineffective Communication Between Sheriff's Detention
               Officers and the Medical Staff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          2.   Inadequate Inmate Access to Medical Care . . . . . . . . . . . . . . . . . . . . . . 24

          3.   Inadequate Staffing of Jail Detention Officers . . . . . . . . . . . . . . . . . . . . 26

          4.   Inadequate Staffing of Medical Professionals and Staff . . . . . . . . . . . . . 27

          5.   Inadequate Medication Administration and Continuity of Care . . . . . . . 29

          6.   Failure to Provide Adequate Medical Care for Inmates With
               Serious Chronic Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.     The Challenged Conditions of Confinement Do Not Reasonably Relate
       to a Legitimate Governmental Objective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Episodic Acts and Omissions

E.     Shepherd Was Exposed to a Substantial Risk of Serious Harm in
       the Dallas County Jail . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       1.     It is Common Medical Knowledge That a Person With Severe
              Hypertension Who is Not Given His Medication is at Substantial
              Risk of Having a Stroke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

       2.     Shepherd Was Repeatedly Denied His Medication and Medical
              Treatment While He Was In the Dallas County Jail . . . . . . . . . . . . . . . 35

       3.     As a Direct Result of Being Denied His Medication and Medical
              Treatment, Shepherd Suffered a Severe Stroke That Left Him
              Paralyzed For Life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

F.     Dallas County Jail Medical Staff Acted or Failed to Act With Deliberate
       Indifference to Shepherd's Substantial Risk of Serious Medical Harm . . . . . . . 38

       1.     Denial of Medication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

       2.     Denial of Follow-up Care After Hypertensive Emergencies . . . . . . . . . 40

       3.     Refusal to Effectively Treat Shepherd During His Third
              Hypertensive Emergency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

G.     Dallas County is Liable for Its Violations of Shepherd's Constitutional
       Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       1.     Dallas County Has an Official Policy, Practice or Custom
              Which Subjects it to Liability Under § 1983 . . . . . . . . . . . . . . . . . . . . . 43

       2.     The Official Policy is Linked to the Constitutional Violation . . . . . . . . 45

       3.     The Official Policy Reflects Dallas County's Deliberate
              Indifference to the Constitutional Violation . . . . . . . . . . . . . . . . . . . . . . 45

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) . . . . . . . . . . . . . . . . . . 9, 34

*Burge v. St. Tammany Parish*, 336 F.3d 363 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Campbell v. City of San Antonio*, 43 F.3d 973 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752 (5th Cir. 2001) . . . . . . . . . . . . . 10, 38

*Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) . . . . . . 10, 34, 38, 45

*Gibbs v. H.M. Grimmette*, 254 F.3d 545 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Gonzalez v. Ysleta Independent School Dist.*, 996 F.2d 745 (5th Cir. 1993) . . . . . . . . . . . . . . . 8

*Hare v. City of Corinth, Miss.*, 74 F.3d 633 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Hernandez v. Tex. Dep't of Protective & Regulatory Services*, 380 F.2d 872 (5th Cir. 2004) . . . 8

*Johnson v. Treen*, 759 F.2d 1236 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002) . . . . . . . . . . . . . . . 3, 8, 10, 34, 43, 44, 45

*Palo ex rel. Estate of Palo v. Dallas County*, No. 3:05-CV-0527-D,
　　　2006 WL 3702655 (N.D. Tex. Dec. 15, 2006) (*Palo I*) . . . . . . . . . . . . . . . . . 3, 8, 9, 10, 43

*Palo ex rel. Estate of Palo v. Dallas County*, No. 3:05-CV-0527-D,
　　　2007 WL 2140590 (N.D. Tex. July 26, 2007) (*Palo II*) . . . . . . . . . . 3, 8, 9, 12, 23, 33, 34

*Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Piotrowski v. City of Houston*, 237 F.3d 567 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Rivera v. Houston ISD*, 349 F.3d 244 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Snyder v. Trepagnier*, 142 F.2d 791 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Webster v. City of Houston*, 735 F.2d 838 (5th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Williams v. Liefer*, 491 F.3d 710 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

**Constitution**

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 43

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case concerns Dallas County's unconstitutional and unlawful denial of adequate medical care to pretrial detainee Stanley Shepherd and other inmates confined in the Dallas County Jail.  For more than two decades, this Court has presided over dozens of cases concerning the Dallas County Jail.  Every few years, the *Dallas Morning News* prints a shocking exposé on the constitutionally inadequate medical care at the Dallas County Jail, with graphic accounts of inmates who have died in horrible circumstances or, like Shepherd, have been rendered permanently disabled.  Each time, Dallas County promises change, and then after the political furor dies down, Dallas County continues to provide the same level of constitutionally inadequate medical care at the Jail as before.

Why?  Former Sheriff Jim Bowles revealed the answer in sworn deposition testimony:

Q.    Sheriff, I've read a reference to [Dallas County] Commissioner Jim Jackson making a statement to the effect of he'd rather pay a million dollar judgment than spend more money on the Dallas County Jail, something to that effect.  Do you have any knowledge about that?

A.    Yes.

Q.    What knowledge do you have about that statement?

A.    Well, when I made my request on occasion to hire more staff, increase wages, admonish him that we were in need of these services to improve our level of delivery, get sort of tight-edged in staffing, we needed to have more staff, we needed to retain staff, and his attitude was – words to the effect that "I can, first off, defend an occasional lawsuit easier than I can afford your extravagance."  And when I suggested that it might be done – a little bit more than just defending, he might be paying a lawsuit, he said, "I can pay off a judgment occasionally easier than I can afford your extravagance."

* * *

Q.     So do you recall the first time hearing Mr. Jackson make the
       statement that he could defend lawsuits or pay judgments easier than
       he could spend money on your extravagances, I think is what he said
       –

A.     Go back as far as 2001, because Knowles was still with me then.  I
       believe Knowles was present one time when it was said.

Q.     Did Councilman Jackson – or Commissioner Jackson say those things
       during open meetings or did he just say it in budget session?

A.     He said it in both . . .

(App. 209, p. 135, l. 21 - p. 136 l. 16 and App. 210, p. 137 l. 1-12)[1]

Conditions at the Dallas County Jail do not improve, and medical care remains

constitutionally inadequate, because year after year after year Dallas County refuses to spend the

necessary funds.  Thanks to Commissioner Jackson's candor, we know that the County would rather

pay an occasional judgment than spend the money necessary to improve conditions.  By the words

of its leaders, and by its actions and omissions, Dallas County has demonstrated its deliberate

indifference to the risk of serious harm that Plaintiff Stanley Shepherd and other inmates suffer due

to the constitutionally inadequate medical care in the Dallas County Jail.  Although he is not

affirmatively seeking summary judgment, Shepherd has adduced evidence sufficient to satisfy the

elements of 42 U.S.C. § 1983, and he has certainly adduced evidence that is more than sufficient to

show genuine issues of material fact that defeat Dallas County's motion for summary judgment.

---

[1]  Because Shepherd's Appendix is voluminous, he submits deposition transcript excerpts in condensed
format.  This brief cites first the relevant Appendix page, and then the specific transcript page and lines within each
Appendix page as well.  Counsel for the parties have entered into an agreement by which depositions and exhibits
from another Dallas County Jail medical care case, *Mims v. Dallas County*, 3:04-CV-2754-M, may be used in this
case for all purposes.  App. 3-5.  In addition, Shepherd denotes pages in his own Appendix by "App." and pages in
Dallas County's Appendix by "Deft. App."

The conditions of confinement portion of Shepherd's case is strikingly similar to that of Frank Palo, whose pending case concerning conditions in the Dallas County Jail was the subject of a Memorandum Opinion and Order by the Court six weeks ago:  *Palo ex rel. Estate of Palo v. Dallas County*, No. 3:05-CV-0527-D, 2007 WL 2140590 (N.D. Tex. July 26, 2007) (*Palo II*).[2]  Shepherd will track the Court's analysis in *Palo I* and *Palo II* in this brief.  The episodic acts and omissions portion of Shepherd's case is strikingly similar to that of Brent Lawson, whose medical care was also repeatedly denied or delayed while he was a pretrial detainee in the very same Dallas County Jail: *Lawson v. Dallas County*, 286 F.3d 257 (5th Cir. 2002).  Shepherd will also track the analysis of the Fifth Circuit in *Lawson* in this brief.  Shepherd respectfully asks the Court to deny summary judgment for Dallas County in this case regarding conditions of confinement for exactly the same reasons that the Court denied Dallas County's motion for summary judgment in the *Palo* case. Shepherd respectfully asks the Court to deny summary judgment for Dallas County regarding episodic acts and omissions for exactly the same reasons that the Fifth Circuit affirmed the district court's determination that Dallas County was liable for violating an inmate's constitutional right to adequate medical care in the *Lawson* case.

---

[2]  Copies of the opinions in *Palo ex rel. Estate of Palo v. Dallas County*, No. 3:05-CV-0527-D, 2006 WL 3702655 (N.D. Tex. Dec. 15, 2006) (*Palo I*) and *Palo II* are provided for the Court's convenience in Plaintiff's Appendix 446-463.

## I.    FACTUAL BACKGROUND[3]

On October 4, 2003, Stanley Shepherd was arrested on a drug possession charge and booked into the Dallas County Jail as a pretrial detainee.[4]  (App. 6, 9)  The Jail's Central Intake Evaluation Form reflects that Shepherd told the intake nurse he had a history of hypertension and other chronic illnesses and he was taking medications, including two doses daily of the blood pressure medication Clonidine.  (Deft. App. 29)  Shepherd had none of his medications with him when he was booked in, so he was dependent on the Jail medical providers to give him his medications.  *Id*.

On October 11, Shepherd told a nurse that he had a history of hypertension for 10 years and had been taking Clonidine.  His blood pressure measured 175/101.  (Deft. App. 36)  On October 14, Shepherd again told the Jail medical staff that he needed to be on blood pressure medication.  *Id*.  Nurse practitioner Linda Moody recorded that Shepherd "wants and insists on Clonidine."  (Deft. App. 37)  She prescribed a different high blood pressure medication, hydrochlorothiazide.  *Id*.  Although prescribed, Shepherd rarely received his blood pressure medication, and weeks at a time would go by when he did not receive any medication whatsoever.  (App. 6-7)

On November 27, Shepherd was brought to the clinic complaining of severe headache, and his blood pressure reading was 165/117.  (Deft. App. 38)  Dr. Kathryn Flangin ordered that Shepherd be given one dose of Clonidine .2 milligrams, and to have his blood pressure checked for three days.  (Deft. App. 33)  This was Shepherd's first dose of Clonidine in the Jail.  (App. 131, p. 17, l. 7-22)  Shepherd's blood pressure was not checked again until December 1.  (Deft. App. 38)

---

[3]  Shepherd incorporates by reference in this brief all of the evidence in his Appendix.

[4]  In addition to Shepherd's and his counsel Ross Teter's testimony, Shepherd asserted that he was a pretrial detainee in his Complaint, and Dallas County did not deny it in its Answer.

On December 1, Shepherd's blood pressure was recorded at 181/133. (Deft. App. 38) A blood pressure reading that high is considered a "hypertensive emergency." (App. 183, p. 6, l. 17-22) After Shepherd was given a single dose of nitroglycerin, his blood pressure decreased to 148/93. (Deft. App. 38) Dr. Flangin ordered a 60-day prescription of Clonidine .2 milligrams to be given twice daily. (Deft. App. 33)

On December 3, Shepherd experienced his second "hypertensive emergency" when his blood pressure reading was 242/132. (Deft. App. 38, App. 183, p. 7, l. 16-24) Nurse James Daughety wrote on Shepherd's chart, "has not received his Clonidine as ordered." (Deft. App. 38) He gave Shepherd an initial dose of Clonidine and after Shepherd took the medication, his blood pressure decreased to 158/100. *Id.* Despite these hypertensive emergencies, no medical provider even monitored Shepherd's blood pressure for the next *seven weeks*. Further, despite the critical nature of his condition, he still did not receive his medication as prescribed. (App. 6, 7)

Throughout Shepherd's incarceration in the Dallas County Jail, he complained constantly that he was not being given his blood pressure medication. (App. 6) Once in a while he was given a single dose of blood pressure medication, but he never received it every day as prescribed. *Id.* Shepherd is positive that he never received it twice in one day, nor did he receive it on consecutive days. *Id.* There were often weeks that would go by during which he would not receive any medication. *Id.*

Shepherd was very concerned about his medical condition in the Jail. He constantly complained verbally to the guards and the Jail medical staff that he was not being given his blood pressure medication. (App. 6) Every time Shepherd saw a nurse or one was close enough to hear

him, Shepherd told the nurse that he was not getting his medication.  (App. 7)  Shepherd's wife Verna  was also very concerned about his medical condition, because Shepherd always told her he was not getting his medication.  (App. 8)  She was so concerned about this that she made numerous calls to the Jail, and each time she reported to the Jail staff that Shepherd was not getting his blood pressure medication.  *Id*.  On several occasions, Mrs. Shepherd was transferred to people that claimed to be part of the medical staff, and she told them the same thing.  *Id*.  She told the medical people that she was worried that her husband would have a stroke if he did not get his blood pressure medication.  *Id*.  Her worst fears were realized on January 22, 2004.

According to the medical records, Shepherd was not seen by a medical provider from the time of his second "hypertensive emergency" on December 3, 2003 until January 22, 2004 at 2:43 p.m., when he went to the nurses station as an emergency, complaining of left-sided weakness and lightheadedness.  (Deft. App. 45)  Nurse Mary Basham recorded Shepherd's blood pressure at 189/125.  *Id*.  She contacted Dr. Flangin, who ordered the nurses to re-check his blood pressure that evening and for the next three days, and ordered he be given doses of Lasix and Lopressor.  *Id*.  This was Shepherd's third "hypertensive emergency" in seven weeks.  Nurse Basham recorded in Shepherd's chart that he was "repetitious" in his complaints.   *Id*.  She told Shepherd to go back to his cell, over his protests that something was very wrong.  (App. 7)

An hour later, on January 22 at 3:45 p.m., Nurse Mary White was summoned by a detention officer to Shepherd's cell, where she found him lying on the floor showing left-sided weakness, slurred speech, and diaphoretic sweating.  (Deft. App. 46)  She was unable to get a blood pressure reading, but Shepherd's pulse was 140 and his respirations were 26.  *Id*.  Nurse White testified that

these symptoms are commonly associated with a stroke.  (App. 179, p. 17, l. 10-19)  By telephone Nurse White notified Dr. Flangin, who ordered that Shepherd be taken to Parkland Hospital by ambulance.  (Deft. App. 46)   Shepherd's Medical Administration Record ("MAR") at the Dallas County Jail for January 2004 shows that the medication techs initialed the form to show that they had given Shepherd Clonidine and other medications on January 23 and 24, *even though by this time he was no longer at the Jail because he had been taken and admitted to Parkland on January 22*. (Deft. App. 41)

On January 22, at the Parkland emergency room, the doctors diagnosed Shepherd with an "intracerebral hemorrhage" from a "hypertension emergency" – Shepherd had suffered an acute hemorrhagic stroke from bleeding in his brain.  (App. 11, 16-17)   Shepherd's systolic blood pressures were noted to be greater than 200.  (App. 16)  When he arrived at Parkland, he was unable to swallow or speak, required intubation and a gastrostomy tube, and was paralyzed on his left side. (App. 16-17) Shepherd was hospitalized for 26 days at Parkland, then Dallas County discharged him to the Veterans' Administration rehabilitation center.  (App. 17)

When Shepherd was booked into the Jail on October 4, 2003, he was a physically active man, age 46 years, who could walk and speak normally.  (App. 6)  Since the day he had the stroke on January 22, 2004, Shepherd has been unable to walk and is permanently confined to a wheelchair with serious disabilities.  (App. 7)  He has lost most of his left side functions.  *Id*.  His left eye and the hearing in his left ear has been affected, and he now wears a hearing aid in his left ear.  *Id*.  His speech is slurred.  *Id*.

---

## II.    STATEMENT OF THE APPLICABLE LAW

Dallas County's brief presents a hodgepodge of cases, most of which are not relevant to Shepherd's case because they have absolutely nothing to do with inmate medical care.  To cite only a few examples of many, Dallas County relies on cases concerning the negligence of a social worker,[5] a police officer killing a person after a warrantless entry,[6] a student sexually molested by a teacher,[7] a police officer shooting a fleeing suspect,[8] a *Brady* violation of suppressing exculpatory evidence,[9] a student stabbed to death by another student,[10] and a mistaken arrest.[11]

Dallas County argues a skewed "interpretation" of the law by pulling statements in these factually irrelevant 1983 cases out of context.[12]  Its proffered view of the law essentially allows it to abdicate its constitutional responsibilities concerning medical care for pretrial detainees regardless of how egregious its policies, acts and omissions are, or the harm those policies, acts and omissions cause.  The Fifth Circuit and this Court have already rejected Dallas County's position in *Lawson* and in *Palo*, respectively, and Shepherd asks the Court to do likewise here.

---

[5]  *Hernandez v. Tex. Dep't of Protective & Regulatory Services*, 380 F.2d 872 (5th Cir. 2004).

[6]  *Pineda v. City of Houston*, 291 F.3d 325 (5th Cir. 2002).

[7]  *Gonzalez v. Ysleta Independent School Dist.*, 996 F.2d 745 (5th Cir. 1993).

[8]  *Snyder v. Trepagnier*, 142 F.2d 791 (5th Cir. 1998).

[9]  *Burge v. St. Tammany Parish*, 336 F.3d 363 (5th Cir. 2003).

[10]  *Rivera v. Houston ISD*, 349 F.3d 244 (5th Cir. 2003).

[11]  *Campbell v. City of San Antonio*, 43 F.3d 973 (5th Cir. 1995).

[12]  Section 1983 cases are intensely fact-specific and are not appropriately analyzed by Dallas County's cut and paste (page 10 of its Brief refers to Shepherd as "Baines"), one-brief-fits-all approach.

Although the constitutional rights of pretrial detainees flow from the due process guarantees of the Fourteenth Amendment rather than the Eighth Amendment's prohibition against cruel and unusual punishment, there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc); *Gibbs v. H.M. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001). Shepherd's Complaint challenges both "conditions of confinement" and "episodic acts and omissions" concerning the constitutionally inadequate medical care at the Dallas County Jail.

In a conditions of confinement case, the constitutional attack is on the "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644; *Palo ex rel. Estate of Palo v. Dallas County*, No. 3:05-CV-0527-D, 2006 WL 3702655, at *2 (N.D. Tex. Dec. 15, 2006) (*Palo I*). Intent by Jail officials is presumed, and the challenged condition will be upheld if it is reasonably related to a legitimate government objective. *Hare*, 74 F.3d at 644-45; *Palo I* at *2. The Supreme Court has explained that "if a condition is not reasonably related to a legitimate goal–if it is arbitrary or purposeless–a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Palo ex rel. Estate of Palo v. Dallas County*, No. 3:05-CV-0527-D, 2007 WL 2140590, at *3 (N.D. Tex. July 26, 2007) (*Palo II*).

In an episodic acts or omissions case, the complained-of harm is a particular act or omission of one or more officials, and the case focuses on "whether [the] official breached his constitutional duty to tend to the basic human needs of persons in his charge." *Hare*, 74 F.3d at 645; *Palo I* at *3. A pretrial detainee alleging that an episodic act or omission violated his constitutional rights must

show that the official's action constituted "deliberate indifference." *Hare*, 74 F.3d at 647-48; *Palo I* at *3. A plaintiff must satisfy an objective and a subjective test to demonstrate deliberate indifference to serious medical needs. First, the plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Then, the plaintiff must show that jail officials acted or failed to act with deliberate indifference to that risk. *Lawson* at 262; *Farmer*, 511 U.S. at 834.

Deliberate indifference is a subjective inquiry – the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it. *Lawson*, 286 F.3d at 262; *Farmer*, 511 U.S. at 837, 839. Deliberate indifference may be inferred when a jail official "knows of and disregards an excessive risk of inmate health." *Farmer*, 511 U.S. at 837. Jail officials exhibit "deliberate indifference" to an inmate's health when they refuse to treat him, ignore his complaints, intentionally treat him incorrectly, or "engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001). A plaintiff may defeat a motion for summary judgment by raising "genuine issues as to facts which, if true, would clearly evince the medical need in question and indicate that the denial of treatment was much more likely than not to result in serious medical consequences, and additionally that the defendants had sufficient knowledge of the situation so that the denial of medical care constituted wanton disregard of the prisoner's rights." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

## III.    ARGUMENT AND AUTHORITIES

The evidence that Shepherd has adduced regarding the constitutionally inadequate medical care provided in the Dallas County Jail is more than sufficient to demonstrate the existence of genuine issues of material fact that preclude summary judgment for Dallas County.  Because there is a substantial amount of evidence that applies to both aspects of his case, Shepherd first discusses the unconstitutional conditions of confinement, then with that context established, turns to the episodic acts and omissions that he challenges.

As a threshold matter, Dallas County provided to the Court – and touted in its motion – documents from the Texas Commission on Jail Standards ("TCJS") regarding the Commission's inspections of the Dallas County Jail from March 2000 through February 20, 2003.  (Deft. App. 25-28)  These inspections typically have very little to do with medical care.  However, an attachment to the February 20, 2003 inspection report – not submitted by the County – lists deficiencies to be corrected, *including* deficiencies relating to medical care.  (App. 428-429)  For example, the inspector's comments for Item 6 are, "Insure that sick calls are being addressed in a timely manner. When an inmate fills out a sick call request, they should be triaged and addressed in a timely manner. Two or three weeks does not constitute a timely manner."  (App. 428)

The inspections governing the time period including and immediately after Shepherd's confinement in the Jail tell a very different story from the County's positive spin on state inspections. In fact, Dallas County *failed* those Jail inspections, and the issues for which the Jail failed inspection included medical care.  (App. 439-445)  On May 3, 2004, TCJS executive director Terry Julian informed Sheriff Bowles and County Judge Keliher that the Jail failed to comply with minimum state

standards and "appropriate corrective measures must be initiated. . . . Failure to initiate appropriate corrective action may cause a remedial order to be issued and enforced . . . ."  (App. 442-444)

In addition, the TCJS had informed Sheriff Bowles in September 2003 – two weeks before Shepherd arrived on October 4, 2003 – that the Dallas County Jail was understaffed.  (App. 430-431) Eighteen months later, Dallas County had still not brought the Jail into compliance.  On April 28, 2005, TCJS executive director Julian informed the Sheriff and Judge Keliher that the Jail was in violation of the current staffing plan, so that "we are prepared to conduct a staffing analysis for the Dallas County Jail to assist you in providing adequate staff for your facility."  (App. 445)

The conditions of confinement that result in constitutionally inadequate medical care at the Dallas County Jail are well documented and well known due to extensive media coverage.  As Commissioner Jackson candidly admitted to Sheriff Bowles, the reason for the unconstitutional conditions can be explained in a single word – ***money***.

## A.    Evidence on Conditions of Confinement

Shepherd's evidence includes sworn deposition testimony and documents from physicians and nurses at the Dallas County Jail, Dallas County and Parkland Hospital officials, and the Sheriff and other Jail officials.  Additionally, Shepherd's evidence includes the investigative report that Dallas County commissioned from Health Management Associates (the "HMA report") and testimony from its author Dr. Michael Puisis, and the report from the Department of Justice's investigation into conditions at the Dallas County Jail, which are discussed briefly below.[13]

---

[13]  These are the same reports that the Court refused to strike in *Palo II*.  Shepherd's Appendix presents voluminous evidence from medical providers at the Jail confirming that the conditions challenged in *Palo* and by Shepherd in this case were essentially the same before and throughout the term of the UTMB contract.  Shepherd asserts that these reports are admissible here for the reasons determined by the Court in *Palo II* at *7-9.

### 1.       The Health Management Associates Report

In December 2004, Parkland on behalf of Dallas County retained the consulting firm Health

Management Associates ("HMA") to perform a comprehensive review of the medical and mental

health services at the Jail.  (App. 287-291)  Dr. Michael Puisis, a specialist in correctional health

with significant experience in both operating jail health services and reviewing such programs across

the United States, performed the on-site analysis and prepared a report (the "HMA report").  (App.

292-343)  In the report, Dr. Puisis described systemic failures in the medical care provided at the

Dallas County Jail, and made dozens of recommendations for improvements.

Many of the findings in the HMA report mirror Shepherd's experience in the Dallas County

Jail.  For example, Dr. Puisis found that "There is no policy or procedure for how inmates who come

into the jail at intake are to receive their medication or to be referred to a physician."  (App. 303)

Dr. Puisis found the system of inmate written requests for medical treatment or "kites" to be

inadequate. (App. 304) Although correctional health standards require that the requests be evaluated

within 24 hours, "nurses have staffing to evaluate these health care requests only two days a week."

(App. 305)  "Sick call" is the term used for actual clinical evaluation by a nurse; Dr. Puisis found

"multiple barriers to inmate access in this process."  (App. 305)  Many more inmates are scheduled

to see the nurses than they have time to see.  *Id.*  Dr. Puisis found that "there is no question that there

is a shortage of health care staff at the Dallas County Jail."  (App. 311)  Additionally, the lack of

availability of Jail officers to bring inmates to the clinic "is a tremendous drag on the efficiency of

staff."  (App. 306)  At any given time, only one detention officer is usually available to escort

inmates to the infirmary or medical staff to inmate housing units.  (App. 319)  "The officer escort

requirement restricts access of staff to patients and creates a barrier on the infirmary unit for clinical care." (App. 319)

Dr. Puisis also found deficient medication administration at the Jail. Jail medical records confirm that patients coming into the jail who are on medication for chronic illnesses do not have their medication promptly restarted. (App. 320 and 284, p. 197, l. 8-22) Dr. Puisis observed that the method of monitoring chronic illness patients at the Jail "is poor to non-existent." (App. 330) "Inmates with chronic disease are seen when their condition deteriorates to an urgent status while the others usually are discharged prior to being seen. This type of system, as evidenced by chart review, results in disease deterioration to the point of requiring hospitalization in multiple individuals." (App. 331) These failures are but a few of the many Dr. Puisis described in his 50 page report, which Shepherd has submitted in his Appendix.

### 2.    The Department of Justice Report

In February and March 2006, the Department of Justice ("DOJ") conducted on-site inspections of the Dallas County Jail (referred to in its report as "DCJ") with consultants in the field of correctional medical care, correctional mental health care, and environmental health and safety. (App. 344-390) The documents they reviewed included medical records contemporaneous with Shepherd's confinement at the Jail. (App. 350-51)

The DOJ summarized its findings in its report:

Having completed the fact-finding portion of our investigation of the Jail, we conclude that certain conditions at DCJ violate the constitutional rights of inmates confined there. As detailed below, we find that DCJ fails to provide inmates with: (1) adequate medical care; (2) adequate mental health care; and (3) safe and sanitary environmental conditions.

---

(App. 345)   The DOJ noted that its own report was "consistent with the findings contained" in the Health Management Associates report by Dr. Puisis.  (App. 345)

The DOJ report discusses thirteen serious deficiencies in medical care at the Dallas County Jail, including several that encompass Shepherd's experience.  The DOJ found:  (1) inadequate intake screening; (2) inadequate acute care; (3) inadequate chronic care; (4) inadequate treatment and management of communicable disease; (5) inadequate access to health care; (6) inadequate follow-up care; (7) inadequate record-keeping; (8) inadequate medication administration; (9) inadequate medical facilities; (10) inadequate specialty care; (11) inadequate staffing, training and supervision; (12) inadequate quality assurance; and (13) inadequate dental care.  (App.  347)

Specific findings of the DOJ include the following:   Dallas County's failure to provide adequate nursing and physician care for the treatment of serious and emergent conditions subjected inmates to serious harm.  (App. 350)  Dallas County fails to provide constitutionally adequate care to meet the serious medical needs of inmates with chronic medical conditions.  (App. 351) Care for inmates with chronic conditions is plagued by delays in the treatment and administration of medication.  (App. 352) Inmates who are identified with chronic health conditions are often not scheduled for follow-up medical assessment.  *Id*.  DOJ also found numerous instances of deficient chronic care that put inmates' health and lives at serious risk.  (App. 353) Inmates routinely miss doses of life-sustaining medications.  (App. 364)

Another significant deficiency is inadequate staffing, training, and supervision.  The DOJ found that the Jail maintains an insufficient number of medical and custody staff to provide adequate medical services.  Delays in access to medical care are exacerbated by an insufficient number of staff

trained to identify, respond, and provide the necessary medical treatment. Currently deficient medical services are hindered further by DCJ's shortage of correctional officers to escort inmates to medical units. (App. 367-368)

In an analysis of 316 referrals for specialty care, DOJ found that one month later, the Jail had not scheduled a single appointment for any of these referrals. DOJ described this as "grossly inconsistent" with generally accepted standards of care. (App. 366) Prior to DOJ's investigation, there was no dental care. After the DOJ's investigation, what passed for "dental care" at the Jail included a dental chair with no water, no suction, no light, no clean instruments, and no dental x-ray equipment. (App. 368) Additionally, throughout the DOJ report are many individual examples of inmates – including inmates there during the time of Shepherd's confinement – who were harmed due to the horrendous, unconstitutional level of medical care at the Jail. (App. 350, 353-354, 357-358, 360, 361-362, 372, 375)

Shepherd's conditions of confinement claim is based on the Dallas County Jail's inadequate and inhumane conditions that prevented detainees from receiving consistent and adequate medical care. Specifically, in this brief Shepherd discusses his challenges to Dallas County's policies and practices regarding: (1) the inadequate funding and monitoring of the UTMB contract; (2) ineffective communication between Sheriff's detention officers and the medical staff; (3) inadequate inmate access to medical care; (4) inadequate staffing of Jail detention officers; (5) inadequate staffing of medical professionals and staff; (6) inadequate medication administration and continuity of care; and (7) failure to provide adequate medical care for inmates with serious chronic conditions. These are related issues that primarily flow from Dallas County's longstanding underfunding of the Jail.

Shepherd also challenges the same inadequate and inhumane conditions substantiated through the HMA report and the DOJ investigation, including: inadequate intake policies and procedures that fail to properly screen inmates' health status, inadequate acute care, inadequate infirmary care, inadequate treatment for mentally ill inmates, including suicidal inmates, inadequate treatment and management of communicable disease, inadequate record keeping, inadequate training and supervision of medical staff, inadequate medical facilities, inadequate specialty care and inadequate dental care. At the very least, the evidence that Shepherd has adduced raises genuine issues of material fact as to the unconstitutional conditions of confinement at the Dallas County Jail.

### B.    Dallas County Retains UTMB to Provide Medical Care at the Jail

A central component of the constitutionally inadequate medical care at the Dallas County Jail is the County's decision to contract out the medical care for the Jail to the University of Texas Medical Branch at Galveston ("UTMB").[14] UTMB's lack of experience with providing medical care in large county jails resulted in its agreement to provide medical care for substantially less than Dallas County's actual costs. This led to the ultimate failure of the contract. UTMB had the contract during the entire time of Shepherd's confinement in the Dallas County Jail.

### 1.    Dallas County Excluded Its Medical Director From the Decision to Award the UTMB Contract

The evidence suggests that Dallas County's only goal in contracting the Jail medical care to UTMB was saving money – not improving, or even seriously evaluating, the medical care proposed for its detainees. Dr. Steven Bowers, the medical director of the Dallas County Jail, testified that

---

[14]  A copy of the contract between Dallas County and UTMB was provided in Dallas County's summary judgment appendix. (Deft. App. 5-22)

both he and Jail psychiatric director Dr. Ken Arfa were excluded from negotiations of the UTMB contract.  They approached Commissioners Court Administrator Allen Clemson and offered to give their input and concerns about medical care into the contract, but their offer was never accepted and they had no role in the process before the contract was signed.  (App. 112, p. 19, l. 11 - p. 20, l. 24) On July 31, 2002, Dr. Bowers wrote a memo to Clemson with questions about staffing, medication distribution, formulary drugs, and emergency care under the proposed UTMB contract.  (App. 401-402)  Clemson, who was very involved in developing and negotiating the UTMB contract, never responded to Dr. Bowers's questions in any way.  (App. 267, p. 21, l. 4-8, App. 111, p. 12, l. 11-22)

Dr. Bowers persisted in bringing his concerns to Dallas County during the negotiations with UTMB.  He wrote a memo to County Judge Lee Jackson on June 10, 2002 in which he raised several concerns about cost savings and the level of inmate medical care provided under the proposal. Because UTMB's revenue would be capped, its bottom line could only be increased by decreasing expenditures.  (App. 394-396)  Dr. Bowers observed that "the less one does for the inmate, the less the expenses incurred and therefore the more lucrative the bottom line."  *Id*.  Despite Dr. Bowers's concerns, Dallas County proceeded with the UTMB contract.  Dallas County's exclusion of Dr. Bowers and Dr. Arfa from the UTMB contract vetting process demonstrates that the County was far more concerned about its potential cost savings than the medical needs of its detainees.

> **2.     From the Beginning, Dallas County Knew That the Costs It Contracted to Pay to UTMB Were Insufficient to Provide Adequate Medical Care**

Dallas County knew from the beginning that the costs it contracted to pay to UTMB for the contract were insufficient to provide adequate medical care at the Jail.  In a memo to the

Commissioners Court dated July 3, 2001, Allen Clemson noted that UTMB had offered "to operate Dallas County's jail health programs for $1.60 per day, per inmate."  (App. 391-393)

> Dallas County and Parkland Health and Hospital Systems current expense for providing adult and juvenile health services is $13,290,375.00.  Based on our June juvenile and adult population data, our cost per detainee is approximately $5.60 per day. We feel when the institutional service providers review Dallas County's jail intake process, juvenile service requirements, and our psychiatric care formulary, the opportunity for a contract rate of $1.60 will be diminished.

(App. 392)  The Commissioners were surely overjoyed at the prospect that UTMB thought it could provide Jail medical care for one-third of Dallas County's actual cost.  Dallas County estimated that the total projected savings to Parkland's budget for the first year of the UTMB contract would be $681,344, and the total savings for the fiscal year 2003 proposed Jail budget would be $1,804,843. (App. 397)  When UTMB investigated the scope of medical care it was expected to provide, it realized the cost would be significantly higher than its initial proposal of $1.60 per inmate per day.

After months of negotiations, Dallas County contracted with UTMB to provide services in December 2002 going forward for $5.49 per inmate per day, which was substantially less than Dallas County's actual costs of $5.60 per inmate per day had been more than a year earlier, in June 2001. Dallas County's funding for jail health care was already insufficient, and it could not reasonably expect UTMB to provide adequate medical care for nearly $2 million less in a single year than the County had been spending.  Dallas County also contracted to share in any "innovative, creative" cost savings that UTMB could achieve, which arguably created a conflict of interest between providing effective medical care and saving money.  (App. 268, p. 53, l. 23 - p. 54, l. 12)

UTMB clearly did not understand, as Dallas County did, that the proposed Jail contract was inadequately funded because its experience was limited to providing medical care for prisons, which

are very different than large county jails.  Dr. Bowers warned County Judge Jackson in his  June 10, 2002 memo of his concerns with the quality of medical care under the proposed UTMB contract, and that UTMB's experience in providing medical care in prisons – with a far more stable population – would not translate effectively to the needs of a large county jail.  (App. 395)

Dr. Bowers knew that the $5.49 contract pricing was unrealistic to provide appropriate medical services at the Jail.  (App. 89, p. 75, l. 9-21)  For years, Dr. Bowers had kept in contact with other large county jails in the United States, and he knew what their inmate costs per day and staffing numbers were compared to Dallas County.  (App.  113, p. 22, l. 16 - p. 23, l. 18)  In the time frame just before the UTMB contract in 2001-2002, other jails' costs for inmate medical care were about $7.50 per inmate per day. (App. 113-114, p. 24, l. 18 - p. 25, l. 2)  Dallas County did not shoot this messenger; it simply ignored him.

The UTMB contract was doomed to fail from the beginning for lack of adequate funding. On May 13, 2004 Kristin Branam, who monitored the contract on behalf of Dallas County, sent an e-mail to Dr. Samuel Ross at Parkland regarding her concerns with medical care at the jail.  (App. 412)  Branam noted that Harris County had been investigated and the result was a federal mandate for funding for minimal care standards:  "The Harris County budget is 30% higher than ours and their population is less than ours.  This is a strong indicator that adequate care (at least according to Federal standards) cannot be provided with the current budget."  *Id.*  Branam believed the fact that UTMB was losing money under the contract negatively impacted its ability to provide medical services at the Jail.  (App. 246, p. 100, l. 11-15)  Dr. Bowers believes the Dallas County

Commissioners have not had the political will to make the necessary changes to correct the problems with the delivery of medical care at the Dallas County Jail.  (App. 99, p. 141, l. 22 - p. 142, l. 8)

By October 2004, UTMB was reporting to Parkland that it had lost $1.5 million under the Jail contract.  (App. 261, p. 165, l. 1-5)  Parkland, on behalf of Dallas County, agreed to raise the contract payment twenty cents to $5.69 per inmate per day, but it was not enough to stem the tide of red ink for UTMB.  (App. 273, p. 42, l. 19 - p. 44, l. 2)  In the fall of 2005, UTMB gave Dallas County notice that it would not be renewing the Jail contract.  (App. 269, p. 159, l. 16-22)

### 3.    The UTMB Contract Was Inadequately Monitored and Enforced

Dallas County retained control over the supervision and management of medical services provided by UTMB under the contract, but failed to take reasonable steps to maintain compliance. The evidence suggests that Dallas County failed to enforce the contract because it wanted to continue saving money – Dallas County was paying UTMB less than its previous actual costs.  Dr. Bowers testified that there was always a discrepancy between what UTMB had contracted to do, and what they could realistically do.  (App. 121, p. 88, l. 21-24)

Kristin Branam monitored the performance of UTMB under the Jail contract on behalf of Parkland and Dallas County, but she did not have the authority to force UTMB to resolve problems that had been identified through the audit process.  (App. 263, p. 186, l. 1-8, App. 245, p. 93, l. 7-11) The entire concept of Dallas County "auditing" UTMB's performance was illusory.  Branam testified that she helped UTMB collect the data on performance standards, but UTMB was essentially auditing itself and she accepted their reports as true – she did not independently verify them, and she never challenged UTMB's findings.  (App. 248-249, p. 115, l. 14 - p. 120, l. 22)

Due to the lack of adequate funding, UTMB was never going to be able to provide adequate medical care at the Jail.  But when specific instances of deficiencies were pointed out, there were never any adverse repercussions for UTMB because Branam did not have the authority to force changes, and Dallas County did not want to upset the apple cart of UTMB providing its Jail medical care on the cheap.  Parkland (on behalf of Dallas County) never imposed a financial sanction on UTMB for failing to have all of the staffing positions filled as required in the contract.  (App. 238-239, p. 24, l. 18 - p. 25, l. 20.)  Branam acknowledged that there were "always vacancies" in staffing throughout the term of the UTMB contract.  (App. 242, p. 52, l. 1-5)

### C.   Conditions of Confinement at the Dallas County Jail Result in Constitutionally Inadequate Medical Care

The HMA report and the Department of Justice investigation confirmed that the conditions of confinement at the Dallas County Jail created constitutionally inadequate medical care.  The HMA report contrasts the inmate medical care that should be provided at the Dallas County Jail according to nationally accepted standards, and deficiencies that Dr. Michael Puisis found in the medical care that was actually provided at the Jail.  In his deposition testimony, Dr. Puisis repeatedly described medical care at the Dallas County Jail as a "broken system."[15]  (App. 280-281, p. 125, l. 23 and p. 143, l. 2-10)  Dr. Bowers testified that during his time at the Jail, **both before and after the UTMB contract began**, the conditions he observed there were consistent with the findings by Dr. Puisis in

---

[15]  At his deposition, Dr. Puisis stated, "I work for the County."  He was represented at the deposition by Dallas County's counsel, followed the instructions given to him by Dallas County's counsel, and was paid for his time by Dallas County.  (App. 279, p. 102, l. 1 - p. 104, l. 24)  Counsel for Dallas County stipulated that:  the HMA report is Dr. Puisis's report, it is true and accurate, it contains his observations at the Jail at the time he was there, it contains his opinions about what those conditions were, and it was shared with the Dallas County Commissioners Court.  (App. 282-283, p. 158, l. 17 - p. 159, l. 7 and p. 162, l. 18-23)

the HMA report.  (App. 127, p. 285, l. 16-23)  Shepherd's own experience at the Dallas County Jail

was virtually identical to the systemic problems found by Dr. Puisis and the DOJ.  Incredibly, even

after the damning findings by Dr. Puisis in the HMA report, "nearly two years later, the alleged

systemic deficiencies had not been ameliorated."  *Palo II* at *8.

Dr. Bowers testified that, to provide humane conditions of confinement as it relates to the

provision of medical care, the inmates should be evaluated as soon as possible when they come in.

That leads to a triage process by which the staff determine whether they need acute care, chronic

care, or no care.  The inmates need adequate access to medical care, based on priority of severity.

There must be access to an emergency room and hospitalization.  The staff must be able to provide

medication to inmates in a prompt manner and continue to provide the right type of medicine and

the right strength.  (App. at 83-84, p. 23, l. 8 - p. 25, l. 6) The evidence shows that Dallas County

does not provide sufficient funds to deliver medical care in accordance with these standards.

Shepherd focuses in this brief on only a few of the many inadequacies documented in the

HMA report and the DOJ report, and incorporates those documents in full herein.  Shepherd now

turns to specific policies and procedures that result in constitutionally inadequate medical care at the

Dallas County Jail.

### 1.   Ineffective Communication Between Sheriff's Detention Officers and the Medical Staff

As surprising as it might seem, one significant reason that the medical providers fail to

provide medical treatment or medication to inmates is because routinely they cannot locate their

patients within the Jail.  Dr. Bowers testified that it "happens all the time."  He explained that the

medical staff are not notified when inmates are moved from one Jail tower to another, and there is

no policy or process to enable communication between the detention staff and the medical staff to ensure that the medical providers know where the patients are located. (App. 100, p. 166, l. 14 - p. 167, l. 21)  As a result, the medical providers are forced to waste much of their time trying to research and track down the inmates.  This has been true consistently throughout the time Dr. Bowers has been Medical Director at the Jail, since 1993.  (App. 100, p. 167, l. 22 - p. 168, l. 1)

Because of the delay in treatment, Dr. Bowers has personally experienced that sometimes chronic conditions become acute and emergent.  (App. 101, p. 171, l. 4-10)  The lack of communication also directly relates to ineffective medication distribution because when the medical staff cannot track the inmates, the inmates might not receive medications that had been ordered, they would not be in the right spot to receive medications, and there would likely be a delay in getting their medications established.  (App. 151, p. 16, l. 18-23)

Dr. Bowers has complained for years about this problem to Sheriff Bowles, who acknowledged the complaints from the medical staff that prisoners were moved about the Jail so frequently that the medical staff had a difficult time tracking them.  (App.  207-208, p. 128, l. 23 - p. 129, l. 9)  Sheriff Bowles did nothing to correct the problem, and his lack of concern was obvious at his deposition, when he admitted that he had no idea how his department notified the medical department when inmates were moved.  (App. 208, p. 130, l. 11-13)

## 2.    Inadequate Inmate Access to Medical Care

The Sheriff's department hinders inmates' access to medical care at the Dallas County Jail in other ways as well.  There are at least two reasons for this:  its policy that inmates may only access medical care through the "kite" system of written requests, and the persistent understaffing of

Sheriff's department officers (which Shepherd will discuss below in section 3).  The HMA report and the DOJ report extensively discussed the problems that result in inmates like Shepherd being unable to effectively access medical care at the jail because of the kite system.

According to Dr. Bowers, inmates seek medical care through the "kite" system by filling out a paper request and putting it in a box outside the cell.  The detention officers pick up the kites, separate out the medical kites, and bring them to the nurses station, where the medical staff process them. (App. 102, p. 202, l. 8-22)  There is no medical oversight of the detention officers segregating the medical requests from the nonmedical requests.  (App. 103, p. 207, l. 7 - p. 208, l. 1)  Dr. Bowers described the inmates' access to medical care at the Jail as "pretty poor" – the medical staff is able to see inmates with non-emergency needs within 72 hours only about 50 percent of the time.  (App. 105, p. 215, l. 16 - p. 216, l. 4)

The HMA report exhaustively detailed several barriers to inmate access to medical care with the kite system – lack of confidentiality, the reliance on detention staff to forward the kites to the medical staff, and most importantly, the lack of medical staff to evaluate the requests for medical care.  (App. 304-305)  This was a longstanding problem – the Texas Commission on Jail Standards inspector found back in February 2002 that inmate kites were not triaged and addressed in a timely manner – "two to three weeks does not constitute a timely manner."  (App. 428)

A week before Shepherd arrived at the Jail, on September 26, 2003, Kristin Branam reported to Dr. Samuel Ross at Parkland that the percentages for inmate access to care in the various jail facilities ranged from the mid-sixties to seventies, which is "unacceptable." (App. 410-411) Access to care in the North Tower was only 45%, which Branam characterized as "alarming." (App. 411)

"Access to care" of 45% means that of the cases reviewed, only 45% of the inmates' kite requests for medical care were answered in a timely manner under the contract and Jail standards. (App. 251, p. 127, l. 8 - p. 128, l. 12)   From August 1, 2003 to September 8, 2003, there were 460 missed appointments of inmates scheduled to see nurses, and 199 x-ray appointments missed. (App. 410)

### 3.      Inadequate Staffing of Jail Detention Officers

Shepherd has already discussed documents from the Texas Commission on Jail Standards regarding Dallas County's inadequate staffing of Sheriff's department personnel at the Jail in September 2003 just before Shepherd arrived, and persisting through at least 2004 and 2005. (App. 430-445)   Sheriff Bowles testified that during his entire twenty-year tenure as Sheriff, the Dallas County Commissioners never once allocated the funds he requested. (App. 198, p. 19, l. 7-8)   The HMA report and DOJ report found that inadequate staffing of Sheriff's department officers has a tremendous negative influence on the medical staff's ability to provide medical care at the Jail.

Sheriff Bowles testified that it was Jail policy that medical staff who want to see inmates in their cells must be escorted by a detention officer. (App. at 207, p. 125, l. 13-19)   Detention officers must likewise escort inmates to the medical department, and medication technicians ("med techs") must be escorted as they move around the Jail delivering medications.   In the memo describing poor inmate access to medical  referred to above, Branam told Dr. Ross, "I believe our main problem here is lack of sheriff's escort." (App. 410)   Branam reported that the Commissioners Court "was forced by jail commission to add 18 additional staff to the sheriff's dept for West Tower to meet minimum staffing levels" which was "met with horror" by the Commissioners because the budget was already

set. *Id.*   As a result, the three additional escort positions that the Commissioners had approved would not in fact be designated for medical transport. *Id.*

The Sheriff's department was acutely aware of the problem of understaffing and its impact on medical care.  Kristin Branam regularly discussed the problems regarding medical transport of inmates with Sheriff's department chiefs.  (App. 252, p. 129, l. 21 - p. 130, l. 22)  Jail Chief Deputy Edgar McMillan testified that in the 2002-2003 time period, he and Dr. Bowers "continuously talked about being short of staff and our inability to keep up with what the medical staff wanted us to do as far as getting people to them to be seen.  There was always discussion about that."  (App. 216, p. 18, l. 4-17)  Dr. Bowers believed that medical care was hampered because the Sheriff's department staffing was inadequate to escort the doctors and nurses to the inmates or the inmates to the doctors and nurses.  (App. 217, p. 24, l. 3-9)  Sheriff's department staffing played a large part in the medical care at the Jail.  (App. 217, p. 23, l. 4-5)

### 4.    Inadequate Staffing of Medical Professionals and Staff

As presented in the HMA report, the DOJ report, and the testimony of medical providers at the Jail submitted in Shepherd's summary judgment evidence, the Jail has long maintained an insufficient number of medical staff to provide adequate medical services.  The HMA report and DOJ report devoted considerable attention to the medical understaffing.  (App. 305-306, 311-312, App. 367-368)  Dr. Bowers testified, "I don't think anyone would deny that for years I have harped on the fact that we were grossly understaffed and underresourced," which he reported to many different people, including his supervisors, over and over.  (App. 93, p. 98, l. 5-21)  He testified that

the issue of inadequate staffing of both medical staff and detention staff at intake has persisted from the time he began working at the Jail to the present.  (App. 84, p. 28, l. 2-22)

On August 12, 2003, Kristin Branam wrote a memo to Steve Hurt of UTMB telling him that one of the Dallas County Jail facilities was not attended by a nurse over the past weekend, which resulted in no medications being passed out there for two days.  (App. 408)   The memo also noted that the North Tower has been left with one nurse for 3,000 inmates, which is a "serious concern." *Id.*  Branam testified that nursing coverage was an ongoing problem throughout the period of the UTMB contract, which began on December 1, 2002.  (App. 256, p. 146, l. 15 - p. 147, l. 1)

From October through November 2004, UTMB and Parkland jointly conducted a staffing study to review current medical staffing levels at the Dallas County Jail.  (App. 421)   They produced a report titled "Staffing Analysis - Dallas County Jail System" dated December 2004.  (App. 420-427) The report concluded that 52.3 additional medical staff positions were needed to provide medical services at the Jail.  (App. 427)   The report noted that UTMB was currently experiencing a $1.5 million deficit under the contract, and that implementing the staffing recommendations would require additional funding.  (App. 426)

Nurse practitioner Linda Moody, who began working at the Jail in 2003, also testified that there were not enough doctors or other medical staff at the Dallas County Jail to cover the basic medical needs of the inmates during the entire time she worked there.  (App. 160, p. 52, l. 12-15) Because of the understaffing, there was no way to ensure that an inmate received the most basic level of medical care.  (App. 160, p. 52, l. 16-22)   There were not enough RNs or LVNs or med techs to carry out the orders of doctors or nurse practitioners.  (App. 161, p. 53, l. 1-15)

### 5.        Inadequate Medication Administration and Continuity of Care

Both before and during the UTMB contract, Shepherd and other inmates were routinely denied their medications as a result of the deficiencies in medication administration. The HMA report, the DOJ report, and the testimony of medical providers at the Jail substantiate that medication administration suffers from significant delays, errors, and lapses as a result of many factors, including inaccurate and inadequate documentation. The Jail fails to administer medications in accordance with prescriptions, maintain medication administration records concurrently with distribution, and follow general standards of care to monitor and adjust inmates' prescribed medication regimens.

According to Dr. Bowers, medication distribution is a huge issue in terms of not having enough staff to pass out the medicines to the thousands of inmates who are on medication. (App. 94, p. 104, l. 21-24) There is a problem of understaffing throughout the medication administration process – having enough staff to get the medicine separated into the pill carts, and having enough staff to pass the medication cell side to cell side to all of the inmates. (App. 96, p. 109, l. 6-15) Part of the problem is inadequate staffing of the Sheriff's department to provide escorts for medical staff passing out medication. (App. 96, p. 109, l. 13-20)

According to the HMA report, Jail medical records confirm that patients coming into the jail who are on medication for chronic illnesses do not have their medication promptly restarted. (App. 320 and App. 284, p. 197, l. 8-22) Sheriff Bowles testified it was official policy at the Dallas County Jail that inmates being booked into the jail with medications were not allowed to keep their medications. (App. 205, p. 115, l. 10-21) The medical department determined how quickly an

inmate would then receive his medications.  (App. 206, p. 119, l. 2-10)  The policy at the Jail was that for routine medication administration, the inmate would be taken to the medical station.  (App. 207, p. 125, l. 1-12)  As demonstrated above, however, there were never enough detention officers to take inmates to the clinic or the nurses station.

Additionally, Sheriff's department officer Travis Richey testified that under the County's regular practice, an inmate is recorded to have "refused" medication or medical treatment even if he simply doesn't answer or is nonresponsive, and there's no way to tell from the MAR form which circumstance it was.  (App. 227, p. 127, l. 20 - p. 128, l. 11 and App. 228-230, p. 135-141)  Kristin Branam was aware that if an inmate slept through the "pill pass" or medication delivery, that it was recorded as a refusal to take the medication.  (App. 256, p. 145, l. 9-20)  As to what was done to stop it from happening, she testified that "we wanted the med techs to make more of an effort to get people to the pill window, and I think that was communicated clearly to them.  I'm just not sure how often they followed that direction."  (App. 256, p. 145, l. 21 - p. 146, l. 1)

The DOJ found that the Jail frequently fails to do the following:  (1) administer medication in accordance with prescriptions; (2) maintain inmate medication administration records ("MARs") concurrently with distribution; and (3) follow general standards of care to monitor and adjust inmates' prescribed medication regimens. (App. 363-365)  Generally accepted correctional medical standards require that facilities administer medication and maintain adequate medical records to meet the medical needs of the inmates and to prevent medication errors and other risks of harm.  *Id.* Regular and systematic reviews of medication usage is also required to ensure that each inmate's

prescribed medication regimen continues to be appropriate and effective for his or her condition. At the Dallas County Jail, inmates routinely miss doses of life-sustaining medications.  *Id.*

Paul Roach, the UTMB pharmacist at the Jail, performed his own audit of the medication administration.  (App. 407)  He took a sample of 10 patients on April 16, 2003, and found that only 50% had received their medications within 24 hours.  (App. 253-254, p. 136, l. 18 - p. 138, l. 22) Two days later, in a sample of 10 patients, only 40% had received their medications within 24 hours. (App. 254, p. 139, l. 3-9)  According to Branam, the UTMB performance standard was 90% of inmates receiving their medications within 24 hours.  (App. 254, p. 138, l. 23 - p. 139, l. 2)

On September 23, 2004 Branam wrote a letter to UTMB Director of Operations Jack Smith about problems with medical services at the Jail, and Smith responded by letter.  (App. 413, 414-416)  Branam reported that the Jail had insufficient stock levels of certain medications, and some med techs were not delivering medications to mentally ill inmates as required, and they were also falsifying the records.  (App. 415)  Branam also wrote that "I am told there is no way to really audit this process as the med tech can initial the MAR that the med was delivered when it may not actually have been administered."  (App. 413)

Branam, Dr. Bowers, and the nurses at the Jail testified to a host of longstanding problems with medication administration, including the following:

(1)     problems locating the patients within the Jail to ensure the medications reached the patients;  (App. 254-255, p. 140, l. 25 - p. 141, l. 4)

(2)     not having enough detention officer escorts for the medication delivery staff;  (App. 255, p. 141, l. 5-13)

(3)     understaffing throughout the medication administration process – lack of enough staff to get the medicine separated into the pill carts, and lack of enough staff to pass the medication cell side to cell side to all of the inmates;  (App. 96, p. 109, l. 6-15)

(4)     having med techs instead of nurses pass out medications; (App. 170, p. 24, l. 5-10 and App. 171-172, p. 27, l. 25 - p. 29, l. 13)

(5)     having many med techs who were foreigners with poor English skills so that the inmates could not understand them, which interfered with their ability to dispense the medication as prescribed; (App. 189-190, p. 12, l. 18 - p. 13, l. 7, App. 171, p. 27, l. 14-19)

(6)     med techs skipping inmates who were asleep or unable to respond when their names were called during the medication delivery, but documenting it as a refusal to take the medication; (App. 256, p. 145, l. 9-20)

(7)     med techs not delivering medications and falsifying the records; (App. 415)

(8)     no accountability because of the inability to audit the process, as the med tech can initial the Medication Administration Records that the medication was delivered when it may not actually have been administered;  (App. 413)

(9)     issues with documentation in finding charts and MARs, and in their reliability;  (App. 255, p. 141, l. 15-24)

(10)    failure to meet the performance objective of delivering the first dose of medication within 24 hours from the time ordered.  (App. 96, p. 110, l. 18-24)

Dr. Bowers testified that he has presented the problems with medication administration up through the chain of command to the Senior Staff meeting of the Sheriff's department, medical providers, and Allen Clemson.  (App. 97-98, p. 116, l. 16 - p. 117, l. 4)  The evidence Shepherd has adduced demonstrates that the poor medication administration in the Jail was a direct cause of Shepherd's stroke on January 22, 2004.  Additionally, it is obvious that Shepherd's MAR for January 2004 was falsified, because the med techs initialed the form showing that they had delivered medication to him at the Jail for two days *after* he was taken by ambulance to Parkland.

6.   **Failure to Provide Adequate Medical Care for Inmates With Serious Chronic Conditions**

The HMA report, the DOJ report, and the testimony of medical providers at the Jail demonstrates that Dallas County's care for inmates like Shepherd with chronic medical conditions fails in the areas of assessment and timely and adequate follow-up medical treatment. The HMA report noted that the inability of inmates to promptly get medicines ordered from a physician "is a significant problem." (App. 330) "The lack of continuity of medication along with the absence of physician evaluations can only promote deterioration of clinical status ultimately resulting in unnecessary hospital and emergency room visits." *Id.* Dr. Puisis observed that the method of monitoring chronic illness patients at the Jail "is poor to non-existent." *Id.* Physicians are only seeing a fraction of the persons with chronic illnesses, which is "a significant lack of access to care." *Id.* The Dallas County Jail's failure to provide adequate medical care to inmates with chronic illnesses is the norm, not the exception. (App. 331) The DOJ report also exhaustively analyzed the inadequate chronic medical care at the Jail. (App. 351-352)

D.   **The Challenged Conditions of Confinement Do Not Reasonably Relate to a Legitimate Governmental Objective**

Shepherd asks the Court to deny Dallas County's motion for summary judgment for the same reasons that the Court denied summary judgment six weeks ago in *Palo II.* Shepherd challenges the very same unconstitutional conditions in the very same Dallas County Jail. These conditions violated Shepherd's constitutional rights and were the foreseeable result of the long-term understaffing and inadequate staffing, training and supervision in the Jail regarding the provision of medical care, because these conditions prevented confined persons such as Shepherd from receiving

consistent and adequate care. These conditions were not reasonably related to any legitimate governmental purpose, but were instead the byproduct of Dallas County's inadequate funding and monitoring of the UTMB contract.

In *Palo II*, Dallas County argued that Palo had not adduced sufficient evidence on the conditions of confinement claim, but did not contend that if the conditions were established, those conditions were rationally related to any legitimate government purpose. *Palo II* at *6. In this case, Dallas County's brief makes no assertion that any of the policies Shepherd challenges were rationally related to any legitimate government purpose, but merely asserts that the County cannot be held liable for any resulting violation of Shepherd's constitutional rights.[16] A reasonable jury could find under the *Bell* standard that the conditions to which Shepherd was subjected were not reasonably related to a legitimate government purpose and therefore "punished" Shepherd in violation of his Fourteenth Amendment rights. *Palo II* at *10, *Bell v. Wolfish*, 441 U.S. 538-39.

### E.    Shepherd Was Exposed to a Substantial Risk of Serious Harm in the Dallas County Jail

Turning to his episodic acts and omissions claim, to prove that Dallas County was indifferent to his serious medical needs, Shepherd must first show objectively that he was exposed to a substantial risk of serious harm while he was incarcerated in the Dallas County Jail. *Lawson*, 286 F.3d at 262; *Farmer v. Brennan*, 511 U.S. at 834.

---

[16] As indicated in Shepherd's response, it is difficult to ascertain whether Dallas County seeks summary judgment on Shepherd's conditions of confinement claim, but it has not styled its motion as a motion for partial summary judgment.

1.    **It is Common Medical Knowledge That a Person With Severe Hypertension Who is Not Given His Medication is at Substantial Risk of Having a Stroke**

Medical professionals have testified in this case that it is common medical knowledge that a person like Shepherd with severe hypertension who is not given his blood pressure medication is at substantial risk of having a stroke. (App. 43) Dr. Flangin testified that it is commonly known by the medical staff at the Jail that if a person has chronic hypertension, it is critical that he receive his medical prescriptions such as Clonidine as ordered. (App. 141, p. 23, l. 7 - p. 24, l. 6) She acknowledged that there can be catastrophic ramifications if a person with chronic hypertension does not receive his prescribed blood pressure medication as ordered. (App. 141, p. 24, l. 10-15)

2.    **Shepherd Was Repeatedly Denied His Medication and Medical Treatment While He Was In the Dallas County Jail**

The medical records and testimony establish, or at the very least create genuine issues of material fact, that Shepherd's medication and medical treatment were repeatedly delayed or denied while he was confined in the Dallas County Jail. Dallas County knew through its own Central Intake Evaluation Form that Shepherd had a history of hypertension, among other chronic conditions, and was currently taking the prescription medication Clonidine twice a day. (Deft. App. 29) Shepherd repeatedly complained that he was not getting his medication, and there are no reliable Jail medical records that reflect that Shepherd was given anything but sporadic doses of any hypertension medication. (App. 6-7) Dr. Bowers testified that hydrochlorothiazide or Clonidine must be taken regularly to be effective rather than sporadically like once a month or twice a month. (App. 132, p. 24, l. 15-20) If a person was receiving Clonidine only every couple of weeks in one-shot doses, it would probably be effective for 24 hours. (App. 132, p. 21, l. 4-6)

On three occasions – December 1, 2003, December 3, 2003, and January 22, 2004 – Shepherd's blood pressure readings were so high that his medical providers at the Jail have testified each constituted a "hypertensive emergency." (App. 183, p. 6, l. 17-22 and App. 183, p. 7, l. 16-24) The first time, on December 1, Shepherd was given a nitroglycerin tablet, Dr. Flangin prescribed Clonidine, and he was sent back to his cell. (Deft. App. 38, App. 183, p. 6, l. 23 - p. 7, l. 3)

The second time, on December 3, Shepherd's blood pressure was recorded at an astonishing 242/132, and Nurse Daughety wrote, "has not received his Clonidine as ordered." (Deft. App. 38) Nurse Daughety gave Shepherd a dose of Clonidine and sent him back to his cell. (Deft. App. 38) After December 3, there in no indication in Jail medical records that the medical providers ever monitored Shepherd's blood pressure for the next *seven weeks*. Not only did the medical staff fail to take vital signs after December 3, Shepherd testified that he did not receive his blood pressure medication as prescribed. (App. 6-7)

The third time, Shepherd testified:

> On January 22, 2004, I told the officer on the floor that I was feeling really bad. The officer escorted me from the cell to the nurses station. While I was sitting on the table in the nurses station, the left side of my body began feeling tingly and numb. This was while the nurse was taking my blood pressure. I told the nurse about the problems I was experiencing. She took the cuff off my arm, and told me that I could go on back to the cell. At that time, I refused to go back, because I knew something was very wrong. I told the nurse that something was wrong with me. The officer demanded that I leave. I went back to the cell. Just before I blacked out, I had another inmate push the panic button and call the officers. He told the officer, "man down." I then blacked out.

(App. 7)

Nurse Mary Basham confirms Shepherd's testimony. She saw Shepherd at the nurses station at 2:43 p.m. on January 22, 2004, and his blood pressure reading was 189/125 while seated. (Deft.

App. 45)  Nurse Basham noted that he was repetitively complaining about left-sided weakness and lightheadedness.  (Deft. App. 45)  She gave him the dose of Lasix and Lopressor that Dr. Flangin ordered, and sent him back to his cell.  (Deft. App. 45)

An hour later, at 3:45 p.m., Nurse Mary White was called to Shepherd's tank and found him lying in the floor, showing left-sided weakness, slurred speech, and diaphoretic.  (Deft. App. 46)  Dr. Flangin instructed that Shepherd be sent to Parkland by ambulance.  (Deft. App. 46)  The ambulance arrived at 4:15 and transported Shepherd to Parkland.  (Deft. App.  46)

Expert witnesses Dr. Lambert King and Nurse Sharon Howard have thoroughly discussed in their declarations and reports the numerous instances where the Jail medical staff delayed or denied Shepherd's treatment and medication.   (App. 19-25, App. 42-53)   Additionally, the Medication Administration Record for January 2004 has obviously been falsified, as the med techs' notations reflect that Shepherd was given Clonidine on a daily basis at the Jail from January 1 through January 24, 2004, *although Shepherd had been taken to Parkland on January 22.*

### 3.   As a Direct Result of Being Denied His Medication and Medical Treatment, Shepherd Suffered a Severe Stroke That Left Him Paralyzed

When Stanley Shepherd was booked in to the Dallas County Jail a pretrial detainee on October 4, 2003, he was physically active and could walk and speak normally.  (App. 6)  On January 22, 2004, Shepherd was taken to Parkland by ambulance.   The diagnosis from the doctors at Parkland was "intracerebral hemorrhage" from a "hypertension emergency" – Shepherd had suffered a severe stroke from bleeding in his brain.  (App. 11, 16-17)

Since the day he had the stroke on January 22, 2004, Shepherd has been unable to walk and permanently confined to a wheelchair.  (App. 7)  The stroke has affected his left side, his left eye and

the hearing in his left ear has been affected, and he now wears a hearing aid in his left ear.  *Id*.  His speech is slurred.  *Id*.  Shepherd went into the Jail a physically active man, and left it less than four months later severely disabled for the rest of his life.

Dr. King testified that as a direct result of the prolonged and egregious failure of the Dallas County Jail health care program and providers to properly care for Shepherd, he suffered a severe stroke from bleeding in the brain on January 22, 2004.  (App. 20) The stroke resulted in a marked deterioration in Shepherd's health status and a high probability of severe and permanent disability for the rest of his life.  *Id*.

### F.     Dallas County Jail Medical Staff Acted or Failed to Act With Deliberate Indifference to Shepherd's Substantial Risk of Serious Medical Harm

The second test to prove that Dallas County was deliberately indifferent to Shepherd's serious medical needs is a subjective inquiry.  Deliberate indifference may be inferred when a jail official "knows of and disregards an excessive risk of inmate health."  *Farmer*, 511 U.S. at 837.  Jail officials exhibit "deliberate indifference" to an inmate's health when they refuse to treat him, ignore his complaints, intentionally treat him incorrectly, or "engage in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Domino*, 239 F.3d at 756.   The evidence Shepherd presents establishes, or at the very least raises genuine issues of material fact, that Dallas County Jail medical staff were consciously aware of the substantial risk of medical harm to him, yet consciously disregarded it.

Dallas County knew from Shepherd's intake form that he had a history of hypertension and was taking Clonidine twice a day.  (Deft. App. 29) Nurse Patricia Thuemmel testified that she knew, and it was common knowledge among the medical staff at the Jail, that for a person with high blood

pressure whose blood pressure readings were trending higher, there was a substantial likelihood of danger if he was not given his blood pressure medication. (App. 191, p. 19, l. 13-21) Dr. Flangin, who has worked as a physician at the Dallas County Jail for thirteen years, testified that it would be common medical knowledge among the Jail medical providers that a person with the blood pressure readings Shepherd had during his hypertensive emergencies could likely have a stroke if it went untreated. (App. 145, p. 39, l. 9-17) Despite this knowledge, Shepherd's medical providers delayed or denied the necessary medical treatment and medication to avert the medical catastrophe that has left him disabled for life.

### 1.   Denial of Medication

Nurse Moody prescribed hydrochlorothiazide for Shepherd's hypertension on October 14. (Deft. App. 37)  Shepherd has testified that he received his blood pressure medication only once in a while, and never consistently.  (App. 6)  Shepherd never received it every day like he was supposed to, and there were often weeks that would go by during which he would not receive any medication. (App. 6)  Dr. Bowers testified that once hydrochlorothiazide or Clonidine were ordered on a daily basis, they should be given on a daily basis because these medications must be taken regularly to be effective, rather than sporadically like once a month or twice a month. (App. 131-132, p. 19, l. 1-13 and p. 24, l. 15-20)

The problems with medication administration at the Jail that Shepherd presented in his conditions of confinement discussion above, and in his Appendix, were well known to the medical staff at the Jail.  Shepherd has presented testimony or documents by Kristin Branam, Jail pharmacist Paul Roach, Dr. Bowers, Nurse Moody, Nurse Thuemmel, and Nurse Basham about the failures of

the medical administration system, including the falsification of MARs.  Dallas County never held UTMB accountable for these failures, and its medical staff exhibited deliberate indifference by failing to provide Shepherd with the blood pressure medication he was prescribed, which caused the hypertensive emergencies he suffered.

Shepherd's medical records demonstrate that the Dallas County Jail staff had actual awareness that Shepherd was facing a substantial risk of serious harm from untreated hypertension, but made a deliberate decision not to follow standards of practice.  (App. 44) Dr. King testified that the progress notes indicate that the medical staff was aware of Shepherd's high potential for stroke as a result of the limited amount of medical attention he received.  (App. 20)  The records indicate an alarmingly high blood pressure on numerous occasions, medical orders to measure his blood pressure that were never carried out, hypertension medication that was critical to his health that was never given, and medical orders that were not followed.  *Id*.  The records indicate that Shepherd's medical condition was recognized even as medical care was denied.  *Id*.  It was even acknowledged on December 3 that Clonidine was not being received as ordered.  *Id*.  Despite this, the medical staff still did not administer his medication as ordered.  *Id*.

## 2.    Denial of Follow-up Care After Hypertensive Emergencies

Additionally, Dr. Bowers found nothing in the medical records to indicate that Shepherd was given any follow-up treatment after the second hypertensive emergency when his blood pressure was a shocking 242/132, and Shepherd was at a substantial risk of a stroke or heart attack at that level if it went untreated.  (App. 132, p.  23, l. 5 - p. 24, l. 14)  There is no record that Shepherd's vital signs were monitored even one time between the December 3, 2003 hypertensive emergency, and

the date of his stroke on January 22, 2004.  Dr. Bowers testified that in the practice of medicine, there is a presumption that if something is not in the medical records, it did not occur.  (App. 134, p. 58, l. 5-8).

Dr. King testified that it is unconscionable that the medical staff failed to do something as simple as take vital signs during the seven week period between his hypertensive emergencies on December 1 and 3, 2003, and his stroke on January 22, 2004.  (App. 20-21)  Dr. King testified that these gross deficiencies in the standard of care represent deliberate indifference to Shepherd's medical needs, since the professional staff that encountered him was aware of his serious medical conditions and the risk of harm if not treated.  (App. 21)  Based upon prior professional training and education, the professional staff of the Dallas County Jail can be expected to know what steps should have been taken to properly assess and treat Shepherd's multiple medical problems.  *Id.*  Therefore, it is Dr. King's opinion that the medical staff at the jail consciously disregarded the risk of harm to Shepherd.  *Id.*  This gross neglect of even the most basic medical care to Shepherd, especially given his critical state on December 3, directly caused the stroke he suffered on January 22, 2004.  *Id.*  In Dr. King's opinion, Shepherd's stroke could have been prevented by ensuring that his vital signs were monitored after the hypertensive emergencies, which would have enabled the medical staff to evaluate whether the Clonidine was effective in reducing his blood pressure from its dangerously high levels on December 1 and 3, 2003.  *Id.*

Nurse Moody testified that if Shepherd did not receive any medical treatment between December 3 and January 22, that would be evidence of complete indifference to his basic medical needs, complete disregard for his well being, and inhumane – she further characterized it as

"inexcusable." (App. 162, p. 57, l. 5-8)  If Shepherd had been receiving his Clonidine and other blood pressure medications between December 3 and January 22, Nurse Moody would not expect him to have had a severe stroke. (App. 162, p. 57, l. 20 - p. 58, l. 1)

Even if Shepherd had been given any Clonidine after Dr. Flangin prescribed it on December 3, the medical staff utterly ignored its responsibility to monitor Shepherd's condition and determine whether or not it was effectively treating his dangerously high hypertension.   Clonidine has side/adverse effects for which the patient must be monitored, including the risk of injury due to orthostatic hypotension, rebound hypertension, or ineffectiveness of Clonidine therapy. (App. 43) Nurse Howard testified that this refusal to monitor Shepherd's vital signs cannot be described as anything other than a reckless disregard for Shepherd's serious medical needs. (App. 44)

### 3.    Refusal to Effectively Treat Shepherd During His Third Hypertensive Emergency

On the day he had his stroke, Shepherd knew that something was terribly wrong. He convinced a guard to take him to the nurses station. He told Nurse Basham that he was feeling tingly and numb. (App. 7)  He was in a hypertensive emergency at the time – when Nurse Basham took his blood pressure, she recorded it as 189/125. (Deft. App. 45)  Dr. Flangin merely ordered a dose of Lasix and Lopressor and told the nurses to re-check Shepherd's blood pressure for the next three days, even though this was his third hypertensive emergency in seven weeks. (Deft. App. 45) Shepherd emphatically told Nurse Basham that something was very wrong, but she ignored his "repetitious" complaints and sent him back to his cell. (App. 7, Deft. App. 45) Thus, although Shepherd had a history of stroke and hypertension and alarming symptoms, he was not forwarded within the system to be evaluated, in person, by a higher level practitioner (RN, MD, NP, PA), but

sent back to his cell. Nurse Howard testified that the decision to simply return him to his cell was a gross and deliberate breach of all standards of care. (App. 44)

Nurse Basham and Dr. Flangin were deliberately indifferent on January 22, 2004 because they were consciously aware of the substantial risk of medical harm to Shepherd, yet consciously disregarded it. *See Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (affirmance of jury verdict finding deliberate indifference when prison guards ignored hypertensive inmate's pleas for help and delayed his medical treatment for a few hours; "a jury could find that the defendants' delay caused Williams six extra hours of pain and dangerously elevated blood pressure for no good reason").

Shepherd has adduced far more evidence of deliberate indifference in his case than the plaintiff did in *Palo I*. Shepherd was denied medication, follow-up care, and treatment by Jail medical staff – not medically untrained Sheriff's detention officers – who knew that their failures to effectively treat Shepherd's dangerous hypertension, administer his medication, and monitor his condition could cause him to suffer a stroke, but they chose to do so anyway. This is the kind of evidence that the Fifth Circuit held was sufficient to show deliberate indifference in *Lawson*, 286 F.3d at 262-63.

### G.    Dallas County is Liable for Its Violations of Shepherd's Constitutional Rights

Finally, the evidence that Shepherd has adduced demonstrates that Dallas County may be held liable for its violations of Shepherd's constitutional rights.

#### 1.    Dallas County Has an Official Policy, Practice or Custom Which Subjects it to Liability Under § 1983

An "official policy" for § 1983 purposes may be either a written policy or "a persistent widespread practice of city officials or employees, which, although not authorized by officially

adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Lawson*, 286 F.3d at 263, *quoting Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). In this case, the sworn testimony of doctors and nurses at the Jail, as well as reports by Dallas County's retained consultant HMA and by the Department of Justice, confirm that the constitutionally inadequate medical care provided at the Jail to Shepherd is not unique, but is routine, ordinary, and typical so that it is a "widespread practice" or custom that fairly represents Dallas County policy.

In his conditions of confinement discussion above, Shepherd addressed many specific Jail policies, procedures and customs – some by the Sheriff himself, and some by the medical staff to whom the Sheriff delegated medical care policy-making authority – that result in the constitutionally inadequate medical care. Sheriff Bowles testified that "the buck stops here" with him, but he delegated policy-making authority to the people charged with the responsibility or accountability for individual Jail operations. (App. 199, p. 34, l. 14-21 and App. 200, p. 40, l. 10-18) During the time of the UTMB contract, UTMB made the policies and procedures for the delivery of health care at the Jail with the agreement of the Sheriff's department and the Commissioners Court. (App. 133, p. 41, l. 18-25)

One of the most striking aspects of the DOJ report is that it describes in exacting detail how constitutionally deficient medical care at the Dallas County Jail is routine and typical. The dozens of inmates whose cases are cited in the report are not isolated instances of people "falling through the cracks," but instead typify everyday conditions at the Jail. (App. 344-390) The DOJ noted that its own report was "consistent with the findings contained" in the previous HMA report by Dr.

Puisis.  (App. 345)  This is further evidence that it was Dallas County's policy and practice to provide constitutionally inadequate medical care to inmates, including Shepherd.

### 2. The Official Policy is Linked to the Constitutional Violation

The evidence Shepherd submits demonstrates that these official policies of Dallas County are the "moving force" behind the constitutionally inadequate medical care provided to Shepherd. *Lawson*, 286 F.3d at 263, *citing Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). As discussed at length above, the policies that caused Shepherd harm at the Dallas County Jail included the inadequate funding and monitoring of the UTMB contract, inadequate inmate access to medical care, inadequate staffing of Jail detention officers, inadequate staffing of medical professionals and staff, inadequate medication administration and continuity of care, and failure to provide adequate medical care for inmates with serious chronic conditions.  The causal relationship between these policies and the harm suffered by Shepherd has been substantiated by the testimony of expert witnesses Dr. King and Nurse Howard, and though the testimony of Jail medical providers like Nurse Moody who treated Shepherd as well.

### 3. The Official Policy Reflects Dallas County's Deliberate Indifference to the Constitutional Violation

Finally, the evidence Shepherd submits demonstrates that the County maintained its official policies with deliberate indifference to the constitutionally protected right to adequate medical care. This is an objective standard that considers not only what the policymakers actually knew, but what they should have known, given the facts and circumstances surrounding the official policy and its impact on Shepherd's rights.  *Lawson*, 286 F.3d at 264, *Farmer v. Brennan*, 511 U.S. at 841. Therefore, constructive notice is adequate.  *Lawson* at 264.

First, Dallas County knew about Shepherd's serious chronic medical conditions from the day he was booked into the Jail on October 4, 2003.  Shepherd's Central Intake Evaluation Form, which was filled out by a nurse at intake, shows that Shepherd reported a history of hypertension, among other chronic conditions.  (Deft. App. 29)  Dallas County knew that he was currently taking the medications nitroglycerin, Thorazine, two doses daily of Clonidine (high blood pressure medication), and pain medication.  *Id.*  Dallas County knew that Shepherd had none of his medications with him when he was booked into the jail, thus he was utterly dependent upon the Jail medical staff to timely provide him with these life-sustaining medications.  *Id.*

Dallas County knew or should have known of the dangers its policies posed to Shepherd.  According to Dallas County Jail policy and practice, inmates with chronic medical conditions such as hypertension were denied ongoing coordinated care and treatment necessary to prevent the progression of their illnesses.  According to Dallas County Jail policy and practice, Shepherd and other inmates were routinely denied their life-sustaining medications.  Shepherd's medical records confirm that he repeatedly requested Clonidine, but even when medical providers at the Jail ordered that he receive blood pressure medication, it was rarely administered to him, and never on the necessary consistent basis.  Additionally, Dallas County refused to adequately fund the Jail, and it was County policy to understaff for detention officers.  It was Dallas County policy to require detention officers to bring inmates to the medical department, or to escort medical personnel to jail cells, so this intentional understaffing ensured that it was impossible for many of the inmates who required medication or medical care to receive it.

The citizens of Dallas County learned about the constitutionally inadequate medical care at the Dallas County Jail once the HMA and DOJ reports were released, but Dallas County knew about the unlawful policies, procedures, and conditions at the Jail for years before that. Shepherd has submitted documents from the Texas Commission on Jail Standards that discuss the Jail's failures to comply with minimum state standards. (App. 428-445) Some deficiencies concerned health care issues such as inadequate intake screening and inadequate inmate access to medical care. *Id.*

Sheriff Bowles testified that before and after UTMB began managing medical care at the Jail, he would discuss medical care issues with Dr. Bowers once or twice a week. (App. 204, p. 102, l. 2-10) Dr. Bowers testified that he interacts with the Sheriff's department on a daily basis to resolve inmate health care issues. (App. 82, p. 10, l. 13-24) Dr. Bowers testified that for years, he has frequently communicated to the Sheriff's department senior staff the risks and impact of the Sheriff's failure to communicate when inmates are moved in the Jail without the medical staff's knowledge. (App. 100, p. 168, l. 2-25) Sheriff Bowles testified that he was familiar with complaints from the medical staff that prisoners were moved about the jail so frequently that the medical staff had a difficult time tracking them. (App. 207-208, p. 128, l. 23 - p. 129, l. 9) Chief Deputy McMillan testified that in 2002-2003, he and Dr. Bowers "continuously talked about being short of staff and our inability to keep up with what the medical staff wanted us to do as far as getting people to them to be seen. There was always discussion about that." (App. 216, p. 18, l. 4-17)

Dallas County has been on notice for years about the deficient health care at the Jail. Dr. Bowers testified that prior to and during 2001, the Immigration and Naturalization Service came and did a medical staffing study at the Dallas County Jail because INS was housing federal inmates there,

and INS had its own criteria.  (App. 92, p. 94, l. 15 - p. 25)   The INS concluded that the Jail was 12 medical providers short – this included doctors, physician's assistants, and nurse practitioners.  (App. 92, p. 95, l. 17 - p. 96, l. 12)

Dr. Bowers testified that both before the UTMB contract went into effect and after, the conditions he observed at the Jail were consistent with the findings by Dr. Puisis in the HMA report. (App. 127, p. 285, l. 16-23)  The medical staff has consistently been understaffed throughout Dr. Bowers's tenure at the Jail, since 1993.  (App. 108, p. 274, p. 21 - p. 275, l. 5)  He thinks that generally, UTMB's management of Jail health care was an improvement from when Dallas County was running it before the UTMB contract.  (App. 107, p. 222, l. 11-16)

Kristin Branam, who monitored the performance of UTMB under the Jail contract on behalf of Parkland and Dallas County, attended monthly quality meetings to measure UTMB's performance on the contract.  (App. 241, p. 45, l. 1-5, App. 263, p. 186, l. 1-8)  Branam dealt with and testified about many of the policies, procedures and conditions that Shepherd challenges, including understaffing of Jail detention officers and medical staff, inadequate medication administration, and the falsification of medication records.  (App. 245-246, p. 93, l. 21 - p. 97, l. 19, App. 256, p. 146, l. 15 - p. 147, l. 1), App. 413-416)

The Dallas County Commissioners – who controlled Jail funding – also knew about the unconstitutionally deficient medical care at the Jail.[17]  During the UTMB contract, about once a month there would be a Senior Staff Committee meeting attended by Dr. Bowers and the UTMB

---

[17]  According to Sheriff Bowles, "I have all the responsibility and none of the authority to execute except that which is given to me through the Commissioners Court.  In this case, the medical is given by the Commissioners Court through the medical department to the Sheriff."  (App. at 202, p. 64, l. 6-11)

practice manager and nurse manager, Sheriff's department chiefs, and Commissioners Court administrator Allen Clemson to discuss medical care issues. (App. 85, p. 38, l. 4 - p. 40, l. 3)  There was also a Sheriff's Department Liaison Committee chaired by Commissioner Price and attended by Clemson, the County budget director, a number of Sheriff's department chiefs, Dr. Bowers and other health care administrators.  Committee recommendations were then presented to the County Commissioners.  (App. 85-86, p. 40, l. 13 - p. 41, l. 10)  In those meetings, Dr. Bowers and the committee discussed issues pertaining to the Sheriff's department that had to do with medical care.  (App. 87, p. 45, l. 5-9)

Clemson testified that he attended every meeting of the Adult and Juvenile Health Advisory/Oversight Committee, which monitored various performance standards and Jail health issues.  Nina McIntosh and Dr. Sam Ross from Parkland were on the Committee, and two of the Commissioners, as well as Sheriff Bowles's chief deputy and another Sheriff's department representative.  (App. 274, p. 59, l. 15 - p. 60, l. 24)  Clemson acknowledged that the issue of delay in inmates getting their medications came up from time to time both before the UTMB contract began and after.  (App. 275, p. 106, l. 1-23)  The medication issue was a performance standard discussed in each of the Advisory Committee meetings.  (App. 275, p. 106, l. 24 - p. 107, l. 9)  Clemson was aware of complaints that inmates had not received their medications, but he dismissively characterized them as "the exceptions, not the rule."  The complaints would go to him or the various Commissioners, but were not documented.  (App. 276, p. 125, l. 15 - p. 128, l. 13)

Shepherd began his brief with Commissioner Jackson's repeated statements to Sheriff Bowles that "I can pay off a judgment occasionally easier than I can afford your extravagance."  The

only reasonable conclusion to draw from this and the other evidence Shepherd has adduced is that

Dallas County deliberately chooses to pay off a judgment occasionally rather than spend the millions

of dollars it would take to provide the required constitutionally adequate medical care to its

detainees.  This is the very essence of deliberate indifference.

## IV.    CONCLUSION

Plaintiff Stanley Shepherd has produced ample competent summary judgment evidence to

demonstrate that genuine issues of material fact exist with respect to his claims that preclude

summary judgment in favor of the Defendant.  Plaintiff therefore asks the Court to deny in all

respects Defendant Dallas County's Motion for Summary Judgment, permit this case to proceed to

trial on the merits, and for all other relief to which Plaintiff may be entitled.

Respectfully submitted,


By:      /s/Don Tittle
               Don Tittle
State Bar #20080200
LAW OFFICES OF DON TITTLE
2515 McKinney Ave., Suite 1400
Dallas, Texas 75201
214/522-8400 - Telephone
214/ 237-0901 - Facsimile

Robert L. Chaiken
State Bar #20080200
CHAIKEN & CHAIKEN, P.C.
One Galleria Tower
13355 Noel Road, Suite 600
Dallas, Texas 75240
(214) 265-0250 - Telephone
(214) 265-1537 - Facsimile

COUNSEL FOR PLAINTIFF STANLEY SHEPHERD

Of Counsel:

Debbie Branscum
State Bar 02897300
P.O. Box 394
Bedford, TX   76095-0394
phone  (214) 206-1975
fax      (214) 432-0130

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of this document was served via the Court's

CM/ECF system on counsel for Defendant Dallas County this 5th day of September, 2007.

  /s/Don Tittle_____
Don Tittle

---